FILED by _____ D.C.
INTAKE

**DEC 2 3 2009**

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. MIAMI

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 09 - 2 3 8 2 3

MC
~~CIV~~-GRAHAM   ~~TORRES~~

IN RE:  Request from Spain Pursuant
to the Treaty Between the United States
of America and the Kingdom of Spain
on Mutual Assistance in Criminal Matters
in the Matter of Manuel Otero Guasch

_____/

## MEMORANDUM OF LAW IN SUPPORT OF APPLICATION FOR ORDER

The United States is seeking an Order appointing a Commissioner to obtain evidence requested by Spain, pursuant to the Treaty between the United States of America and the Kingdom of Spain on Mutual Assistance in Criminal Matters, Treaty 102-21, signed November 20, 1990 (entered into force June 30, 1993) [hereinafter referred to as the "Treaty"], in its Treaty Request relating to a criminal matter. The Treaty obligates the United States and empowers this Court to provide assistance to Spain in criminal matters. This Court is also empowered to provide assistance by the federal statute governing the provision of assistance in foreign judicial proceedings generally, 28 U.S.C. §1782, and by its own inherent authority, In re Letter Rogatory from the Justice Court, District of Montreal, Canada, 523 F.2d 562 (6th Cir. 1975).

A treaty constitutes the law of the land. U.S. Const. art. VI. The provisions of a treaty have equal footing with acts of Congress and are binding on the courts. Asakura v. City of Seattle, Washington, 265 U.S. 332, 341 (1924); United States v. The Peggy, 5 U.S. 103 (1801).

The United States and Spain entered into the Treaty for the purpose of promoting judicial cooperation in criminal matters. The Treaty obliges each state to provide assistance in criminal investigations and proceedings. Art. 1(1). The assistance covered includes producing documents,

taking testimony or statements, locating witnesses, and executing search and seizure requests.  Art.

1(2).

Article 5(3) of the Treaty provides that:

> Requests shall be executed in accordance with the laws of the Requested State except to the extent that this Treaty provides otherwise. However, the method of execution specified in the request shall be followed except insofar as it is prohibited by the laws of the Requested State.

Article 8(1) of the Treaty further provides that:

> A person in the Requested State from whom evidence is requested pursuant to this Treaty shall be compelled, if necessary, to appear and testify or produce any item, including but not limited to documents, records, and articles of evidence.   A person who gives false testimony, either orally or in writing, in execution of a request, shall be subject to prosecution and punishment in the Requested State in accordance with the criminal laws of that State.

The Treaty requires the two states to provide assistance to each other in investigations and

court proceedings covered by the Treaty.  However, where no treaty is in force, a federal district

court would nonetheless be empowered, within its discretion, to order the production of evidence

under 28 U.S.C. § 1782, the statute governing the provision of assistance in foreign judicial

proceedings generally.  Under Section 1782, any interested person, whether a foreign country, a

foreign judicial authority, or a litigant in a foreign court, may seek assistance regardless of the

availability of reciprocal assistance from the foreign jurisdiction. S. Rep. No. 1580, 88th Cong., 2d

Sess. 1, reprinted in 1964 U.S. Code Cong. & Admin. News 3872.

As stated in the Letter of Submittal to the President from the Department of State of

November 8, 1991, the Treaty is intended to be self-executing and, for the most part, will "utilize

existing authority of the federal courts, particularly 28 U.S.C. § 1782."   Pursuant to Section 1782,

a court may appoint a Commissioner to gather evidence on behalf of the court and to submit the evidence, through appropriate channels, to the requesting nation. Section 1782 further provides that: "To the extent that the order does not prescribe otherwise, the testimony or statement shall be taken, and the document or other thing produced, in accordance with the Federal Rules of Civil Procedure."

Thus, the Commissioner has the power to receive the testimony or statements of witnesses and the production of documents or other things, and the court may prescribe the practice and procedure for taking the testimony or statements or producing documents or other things. One such procedure may be the use of the attached form, entitled Commissioner's subpoena, to obtain the requested testimony or statements and the requested documents or other things. In addition, it is customary that requests for international legal assistance in criminal matters be executed without notification, by the requested state, to the target of a foreign criminal investigation or a foreign criminal defendant, unless a contrary intention is apparent from the nature or content of the request. If a notice is required or contemplated, the requesting authority usually makes the notice itself or explicitly asks in the body of the request that a certain notice be made incident to execution. For these reasons, it is requested that this Court authorize the use of Commissioner subpoenas and prescribe that the execution of the request proceed without notice to the targets or defendants in the foreign criminal proceedings.

The instant Treaty Request has been made by the Spanish Ministry of Justice, the Central Authority under Article 2 of the Treaty, in connection with a current criminal investigation by the Criminal Court No. 7 of Barcelona, Spain. As stated in the diplomatic notes accompanying the Treaty which "express the understanding" of the Treaty partners, Article 2 is to be interpreted so that "[r]equests made on behalf of the courts in the Kingdom of Spain, for purposes of applying the laws

of the United States, shall be considered requests of a judicial authority."

The Spanish authorities are investigating Manuel Otero Guasch (OTERO GUASCH) for fraud. OTERO GUASCH was the manager/agent for artist Jose Gomez Romero (GOMEZ ROMERO). On behalf of GOMEZ ROMERO, OTERO GUASCH signed a contract with Casual Technologies, Inc. and 305 Producciones, Inc. for GOMEZ ROMERO's performance. Casual Technologies, Inc. paid OTERO GUASCH $150,000 up-front and then paid another $150,000 when GOMEZ ROMERO, arrived in Miami. According to a contract, both GOMEZ ROMERO and OTERO GUASCH would receive $150,000. Allegedly, however, OTERO GUASCH only paid GOMEZ ROMERO $75,000 and withheld the other $75,000 for himself. An investigation into this matter confirmed that OTERO GUASCH made a $50,000 payment of the $75,000 he withheld for GOMEZ ROMERO to the company 305 Producciones, Inc.

In furtherance of their investigation, the Spanish authorities are requesting bank records from Total Bank and corporation records related to 305 Producciones, Inc.

Accordingly, to execute this request, the government moves this Court to issue the attached Order appointing Assistant United States Attorney Michael J. O'Leary as Commissioner, authorizing him to take the actions necessary, including the issuance of Commissioner's subpoenas, to obtain

4

the evidence requested, and to adopt such procedures in receipt of the evidence as are consistent with the intended use thereof in Spain.

WHEREFORE, the government requests that the Court enter the proposed order.

Respectfully submitted,

JEFFREY H. SLOMAN
ACTING UNITED STATES ATTORNEY

By: _____

MICHAEL J. O'LEARY
ASSISTANT UNITED STATES ATTORNEY
District Court No. A5501261
99 Northeast 4th Street
Miami, Florida 33132
Telephone No. (305) 961-9131
Facsimile No. (305) 536-4699
E-Mail Address: Michael.Oleary@usdoj.gov

COMMISSIONER'S SUBPOENA

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

TO: _____

_____

_____

I, Michael J. O'Leary, an Assistant United States Attorney for the Southern District of

Florida, acting under the authority of the Treaty between the United States of America and the

Kingdom of Spain on Mutual Assistance in Criminal Matters, and Title 28, United States Code,

Section 1782, for the purpose of rendering assistance to Spain, command that you appear before me

in Room 600, at the James Lawrence King Federal Building, 99 NE 4th Street, Miami, Florida, on

_____, 2009, at ___ a.m./p.m., to provide testimony/documents regarding an alleged

violation of the laws of Spain, namely, fraud, and that at the time and place aforesaid you provide

the following:

For failure to attend and provide testimony/said documents, you may be deemed guilty of

contempt and liable to penalties under the law.

Dated:

COMMISSIONER MICHAEL J. O'LEARY
Assistant United States Attorney for the
Southern District of Florida
Telephone No. (305) 961-9131

3

## CRIMINAL COURT NO. 7 OF BARCELONA

Barcelona 1st July 2009

In accordance with article 4.2 of the Treaty on Mutual Legal Assistance on Criminal Matters between the Kingdom of Spain and the United States of America, signed in Washington on 20th November 1990, and in accordance with the judicial resolution dictated in this court, it is proper to dictate the following request:

  a) Authority in Charge:
JUDGE-MAGISTRATE:  THE RT. HON. MANUEL MARTÍNEZ AROCA
CLERK OF THE COURT: THE HON. MR. IGNACIO RIVERA FORCEN

  b) Description of the matter: (Description taken from the formal written indictment made by José Gómez Romero)

José Gómez Romero placed a criminal complaint against Manuel Otero Guasch which has led to Preliminary Proceedings 5041/05 of the Court of Instruction 26 of Barcelona, becoming Expedited Proceedings No. 122/09 of this Court. A formal accusation has been made against Manuel Otero Guasch for the crime of misappropriation.

Manuel Otero Guasch was the manager-representative of José Gómez Romero through the company Sueños de Comunicación S.L. He signed a contract with the company Casual Technologies Inc. and the company 305 Producciones Inc., both based in Miami. Casual Technologies Inc. paid Sueños de Comunicación S.L., or rather Mr Manuel Otero Guasch, $150,000 in a contract on 4/6/2002, which left the remaining 50% to be paid when the artist (José Gómez Romero – Dyango) reached Miami and in any event prior to any of the contracted performances taking place.
The accused man Manuel Otero Guasch has only paid José Gómez Romero $75,000, although in reality he only received $56,085.60 after costs and commissions had been deducted. There is an amount of $75,000 which should have been paid to José Gómez Romero but was never paid by the accused person. It was requested from him by Burofax on 13/5/2005. From the documentation provided by the accused person it has been confirmed that part of the $75,000 was used to make a payment of $50,000 to a company called 305 Producciones Inc. Sueños de Comunicación S.L. and 305 Producciones are two companies with the same registered address, earning a high commission which is almost the amount that was paid to José Gómez.
The accused person says that the amount of $10,000 was paid to the musicians who accompanied my client, which is patently false, since none of them has been paid by the accused person or the company Sueños de Comunicación. The remaining amount of €15,000 has been kept by the accused person as a commission. There is no document which confirms these facts, nor a liquidation signed by my client for the $75,000. The accused man acknowledges in his declaration of 21/11/2005 that he received the quantity of $150,000 for the performances contracted from José Gómez through his company Sueños de Comunicación. Manuel Otero, in his declaration confirmed and endorsed the embezzlement and verified that he had been paid based on an ingenious form of deception, denied the quantity he had allegedly embezzled from my client, which was $75,000, a quantity derived from the signing of the performance contract by José Gómez with Casual Technologies Inc. in which Aria 305 Producción acted as an intermediary without my client's knowledge.

Seprotec

Traductors i Intèrprets
Casp, 31, 3r 1a - 08010 Barcelona
CIF B82695842

c) Description of the evidence requested:

Require TOTAL BANK MIAMI, FL to provide the following documentation:

-A report on all the accounts – current, deposit or any other kind – which are or have been held by Manuel Otero Guasch or have his signature registered.
-An extract of each of these accounts from 4/6/2002 to 15/4/2004. In this extract the people making the deposits or transfers of funds and their reasons for payment must be indicated.
-A report on all the accounts – current, deposit or any other kind – which are held by Sueños de Comunicación S.L. at the bank.
-An extract of each of these accounts from 4/6/2002 to 15/4/2004, indicating the people making any deposits, withdrawals or transfers of funds and their reasons for payment.

Require the company 305 Productions Ltd, with its registered address at 1330 West Ave. Suite 2702, Miami Beach FL 33139 to indicate who have been the shareholders in the company from the day of its constitution until the present day.

d) Purpose for which this evidence is requested:

1st.- To comply with the ruling dated 1/7/2009 in which the evidence requested by the private prosecution was admitted.
2nd.- To be able to reproduce the evidence at trial.

-In accordance with point 3 of article 4, the identity of the person who will need to provide the evidence is specified below:

Total Bank of Miami, FL.


THE JUDGE-MAGISTRATE                    THE CLERK OF THE COURT

(signed and sealed)                          (signed and sealed)




Traductors i Intèrprets
Casp, 31, 3r 1a - 08010 Barcelona



MINISTERIO
DE JUSTICIA

SUBSECRETARIA DE JUSTICIA

SUBDIRECCION GENERAL DE
COOPERACION JURIDICA
INTERNACIONAL

O   F   I   C   I   O

S/REF.

N/REF.   0002565 / 2009 - CAP

FECHA   20/08/2009

ASUNTO   COMISIÓN ROGATORIA RELATIVA A MANUEL OTERO
GUASCH

UNITED STATES DEPARTMENT OF JUSTICE
CRIMINAL   DIVISION   OFFICE   OF
INTERNATIONAL AFFAIRS
- 1301, NEW YORK AVENUE, N.W. 9TH
FLOOR -
20005 WASHINGTON D.C. ESTADOS UNIDOS



Adjunto se remite comisión rogatoria procedente del JUZGADO DE
LO PENAL N. 7 (BARCELONA), relativa a *MANUEL OTERO
GUASCH* por la que se solicita INFORMACION BANCARIA, por un
delito de APROPIACION INDEBIDA, con el ruego de que la dirija a
las autoridades competentes de MIAMI (ESTADOS UNIDOS).

Esta solicitud se realiza al amparo de lo dispuesto en el Tratado de
Asistencia Mutua Judicial entre el Reino de España y los Estados
Unidos en Materia Penal, hecho en Washington el 20-11-90 (B.O.E. 17-
6-93)..

Se ruega informe del curso dado a la presente solicitud, a fin de
comunicarlo a las autoridades requirentes, aprovechando la ocasión para
agradecerle su colaboración.

Madrid a 20/08/2009

LA SUBDIRECTORA GENERAL DE COOPERACIÓN
JURÍDICA INTERNACIONAL (p.9).

Paula Mongé Royo
(Jefa de Área de Auxilio Judicial)

82- 31936

 JUZGADO DE LO PENAL 7 DE BARCELONA

En Barcelona, a 01 de julio de 2009.

De conformidad con el art. 4.2 del Tratado de Asistencia Jurídica Mutua en Materia Penal entre el Reino de España y los Estados Unidos de América, hecho en Washington el 20 de noviembre de 1990, y acorde a la resolución judicial dictada en este juzgado, se procede a dictar la siguiente solicitud:

a)Autoridad encargada:
MAGISTRADO-JUEZ: ILMO. SR. D. MANEL MARTÍNEZ AROCA
SECRETARIO JUDICIAL: ILTRE. SR.D. IGNACIO RIVERA FORCEN

b)Descripción del asunto: (Descripción derivada del escrito de acusación formulado por José Gómez Romero)

Por José Gómez Romero se interpuso una querella criminal contra Manuel Otero Guasch que ha dado lugar a las Diligencias Previas 5041/05 del Juzgado de Instrucción 26 de Barcelona, transformándose en Procedimiento Abreviado número 122/09 de este Juzgado. Se ha formulado acusación contra Manuel Otero Guasch por un delito de apropiación indebida.

Manuel Otero Guasch era el manager-representante de José Gómez Romero a través de la sociedad mercantil Sueños de Comunicación S.L. Firmó un contrato con la sociedad Casual Technologies, INC y la sociedad 305 Producciones, ambas con domicilio en Miami. Por Causal Technologies, INC se abonó a Sueños de Comunicación S.L., o lo que es lo mismo, a D. Manuel Otero Guasch en contrato de 04/06/02 150.000 $, faltando por abonar el otro 50%, que se realizaría cuando llegara el artista (José Gómez Romero-Dyango) a Miami, y siempre antes de las actuaciones contratadas.

El acusado Manuel Otero Guasch únicamente ha liquidado a José Gómez 75.000$, aunque realmente percibió 56085.60$ después de descontados otros gastos y comisiones. Que existe 75.000$ que corresponden a José Gómez y que nunca le han sido liquidadas por el acusado. Que se lo pidió por burofax el 13/05/2005. De la documentación aportada por el acusado afirma que se ha utilizado los 75.000$ para el pago de 50.000$ de una empresa llamada 305 Producciones INC. Que Sueños Comunicación y 305 Producciones son dos sociedades con el mismo domicilio, que se lleva una gran comisión de casi lo que se le liquidó a José Gómez.

Que el acusado dice que la cantidad de 10.000$ ha sido pagada a los músicos que acompañan a mi representado lo cual es totalmente falso pues ninguno de ellos ha cobrado del acusado o de la empresa Sueños de comunicación. Que la restante cantidad de 15.000 € (euros) se la ha embolsado el acusado por su comisión. No hay ningún documento que acredite estos hechos, ni liquidación firmada por mi representado de los 75.000$. El acusado reconoció en su declaración de fecha 21/11/05 que recibió la cantidad de 150.000$ por las

Administración de justicia a Catalunya • Administració de justícia en Cataluña



...ciones contratadas en nombre de José Gómez mediante su sociedad Sueños de Comunicación. Que Manuel Otero, en su declaración constató y refrendó la apropiación indebida y refrendó que había cobrado basándose en una ingeniosa forma de mentir, negó totalmente la cantidad apropiada presuntamente a mi mandante y que es de 75.000$, cantidad derivada de la firma del contrato de actuación de José Gómez con Casual Technologies y en que participó como intermediario Aria 305 Producción sin que mi mandante tuviera conocimiento de éste.

c)Descripción de las pruebas solicitadas:
*Que se requiera al TOTAL BANK MIAMI, FL para que aporte la siguiente documentación;

-Informe sobre todas las cuentas corrientes, de depósito o de cualquier otro tipo que posee o ha poseído o tenga firma registrada Manuel Otero Guasch.
-Extracto de cada una de estas cuentas desde el día 04/06/2002 hasta el 15/04/2004. En tal extracto se deberá indicar los conceptos y las personas a las que se hace los ingresos o transferencias o traspasos de fondos.
- Informe sobre todas las cuentas corrientes, de depósito o de cualquier otro tipo que posee SUEÑOS COMUNICACIÓN L.C. en su entidad.
- Extracto de cada una de estas cuentas desde el día 04/06/2002 hasta el 15/04/2004. En tal extracto se deberá indicar los conceptos y las personas a las que se hace los ingresos o transferencias o traspasos de fondos, en especial todos los extractos de la cuenta 19877006 desde las fechas de 04/06/2002 hasta el 15/04/2004, con indicación de los conceptos y personas que ingresan o retiran, o se les transfiere monetario o se traspasan fondos.

*Que se requiera a la sociedad 305 Productions INC con domicilio en 1330 Wet Ave. Suite 2702, Miami Beach FL 33139 para que indique quienes han sido los propietarios de las participaciones de la sociedad desde el día de su constitución a la actualidad.

d)Finalidad por la que se solicitan las pruebas:

1º Dar cumplimiento al auto de fecha 01/07/09 por el que se admiten las pruebas de la acusación particular.
2º Poder quedar reproducidas las pruebas en el acto del juicio oral.

-De conformidad con el punto 3 del artículo 4, se pasa a reseñar la identidad de la persona que ha de proporcionar la prueba:

Total Bank of Miami, FL.

EL MAGISTRADO JUEZ



EL SECRETARIO JUDICIAL

| 102D CONGRESS<br>2d Session | SENATE | TREATY DOC.<br>102–21 |
|---|---|---|

# TREATY WITH SPAIN ON MUTUAL LEGAL ASSISTANCE IN CRIMINAL MATTERS

---

# MESSAGE

FROM

# THE PRESIDENT OF THE UNITED STATES

TRANSMITTING

THE TREATY ON MUTUAL LEGAL ASSISTANCE IN CRIMINAL MAT-TERS BETWEEN THE UNITED STATES OF AMERICA AND THE KINGDOM OF SPAIN, SIGNED AT WASHINGTON ON NOVEMBER 20, 1990



JANUARY 22, 1992.—Treaty was read the first time, and together with the accompanying papers, referred to the Committee on Foreign Relations and ordered to be printed for the use of the Senate.

---

U.S. GOVERNMENT PRINTING OFFICE

WASHINGTON : 1992

59-118

# LETTER OF TRANSMITTAL

THE WHITE HOUSE, *January 22, 1992.*

*To the Senate of the United States:*

With a view to receiving the advice and consent of the Senate to ratification, I transmit herewith the Treaty on Mutual Legal Assistance in Criminal Matters between the United States of America and the Kingdom of Spain, signed at Washington on November 20, 1990. I transmit also, for the information of the Senate, the Report of the Department of State with respect to the Treaty.

The Treaty is one of a series of modern mutual legal assistance treaties being negotiated by the United States in order to counter criminal activities more effectively. The Treaty should be an effective tool to assist in the prosecution of a wide variety of modern criminals, including members of drug cartels, "white collar criminals," and terrorists. The Treaty is self-executing.

The Treaty provides for a broad range of cooperation in criminal matters. Mutual assistance available under the Treaty includes: (1) the taking of testimony or statements of witnesses; (2) the provision of documents, records, and evidence; (3) the execution of requests for searches and seizures; (4) the serving of documents; and (5) the provision of assistance in proceedings relating to the forfeiture of the proceeds of crime and restitution to the victims of crime.

I recommend that the Senate give early and favorable consideration to the Treaty and give its advice and consent to ratification.

GEORGE BUSH.

(III)

# LETTER OF SUBMITTAL

————

DEPARTMENT OF STATE,
*Washington, November 8, 1991.*

The PRESIDENT,
*The White House.*

THE PRESIDENT: I have the honor to submit to you the Treaty on Mutual Legal Assistance in Criminal Matters between the United States of America and the Kingdom of Spain (the "Treaty"), signed at Washington on November 20, 1990. I recommend that the Treaty be transmitted to the Senate for its advice and consent to ratification.

The Treaty covers mutual legal assistance in criminal matters. In recent years, similar bilateral treaties have entered into force with The Bahamas, Canada, Italy, Mexico, the Netherlands, Switzerland, Turkey and the United Kingdom concerning the Cayman Islands; and others have been concluded and ratified by the United States (but have not yet entered into force) with Belgium, Colombia, Morocco, and Thailand; or concluded and signed with Argentina, Jamaica, Nigeria, Panama and Uruguay. The Treaty contains many provisions similar to those in the other treaties.

The Treaty is designed to be self-executing and will not require implementing legislation. It will enhance our ability to investigate and prosecute drug-related money laundering offenses.

Article 1 provides for assistance with respect to investigations and prosecutions in criminal matters. This was understood by the Parties to include assistance in all related proceedings, whether criminal, civil or administrative. This would include, for example, cooperation in proceedings, which may be civil in nature, to forfeit the proceeds of drug trafficking.

There is no double criminality requirement for most forms of assistance under the Treaty, except in cases of forfeiture and restitution. For all other forms of assistance, the Requested State is required to execute a request without regard to whether the underlying offense would constitute a crime under its own laws.

Article 1 also contains a non-exhaustive list of the types of assistance to be provided under the Treaty; these include: provision of documents, records and evidence; executing requests for searches and seizures; obtaining witness testimony; and other forms of assistance. The article explicitly states that it is not intended to

VI

create rights in private parties to obtain, suppress, or exclude any evidence, or to impede the execution of a request.

Article 2 defines the Central Authorities for purposes of the Treaty. For the United States, the Central Authority is the Attorney General or persons designated by him. For Spain, it is the Ministry of Justice or its designees: The article provides that requests shall be made directly between the Central Authorities.

Article 3 sets forth the circumstances under which a Party may deny assistance under the Treaty. The Requested State may deny requests relating to a military offense and requests whose execution would prejudice the security or similar essential interests of the Requested State. Before denying assistance, the Central Authority of the Requested State is required to consult with its counterpart in the Requesting State to consider whether assistance can be given in whole or in part subject to such conditions it deems necessary. If the Requesting State accepts the conditions imposed, it is bound to comply with them. The Requested State is obligated to inform the Requesting State of its reasons for denying any request.

Article 4 prescribes the form and content of written requests under the Treaty, specifying in detail the information required in each case in order to facilitate the most complete execution of a request possible. The article permits other forms of request in case of urgency, but requires written confirmation within ten days thereafter in the form prescribed. These requirements are similar to those contained in other mutual legal assistance treaties to which the United States is a Party.

Article 5 requires the Requested State to comply promptly with a request or transmit it to the competent authorities who are required to do everything in their power to execute it. Courts in the Requested State are empowered to issue subpoenas, search warrants or other orders necessary to execute a request.

Article 5 further requires that requests be executed in accordance with the laws of the Requested State unless the Treaty provides otherwise. The method of execution specified in the request, however, must be followed unless prohibited by the laws of the Requested State.

The article also permits the Requested State to postpone or condition execution of a request if, in consultation with the Requesting State, it determines that execution would interfere with an ongoing investigation or proceeding in the Requested State. Any conditions agreed to by the Requesting State in order to obtain the assistance must be complied with.

Article 5 also requires the Requested State, if so requested by the Requesting State, to use its best efforts to keep a request and its contents confidential and to inform the Requesting State if the request cannot be executed without breaching confidentiality so that the Requesting State may have the opportunity to decide whether to pursue the request or to withdraw it in order to maintain confidentiality.

The article requires the Requested State to respond to reasonable inquiries by the Requesting State regarding the status of execution of a particular request; to report promptly to the Requesting State

VII

the outcome of its execution; and, if the request is denied, to inform the Requesting State of the reasons therefor.

Article 6 apportions between the two States the costs incurred in executing a request.

Article 7 enables the Requested State to impose confidentiality and use restrictions on information or evidence furnished under the Treaty, and requires the Requesting State to use its best efforts to comply with such conditions. Once information or evidence is made public in the Requesting State in accordance with the Treaty, no further limitations on use apply.

Article 8 requires the Requested State to compel, if necessary, the taking of testimony or the production of documents or other evidence in its territory on behalf of the Requesting State. Any false testimony given in the execution of such a request is prosecutable under the criminal laws of the Requested State. The Requested State is required to inform the Requesting State in advance of the date and place of the taking of testimony or evidence; to permit the presence of any persons specified in the request, such as the accused, counsel for the accused, or other interested persons; and to allow such persons to question the person whose testimony or evidence is being taken.

The article also specifies that any assertion of immunity, incapacity or privilege available under the laws of the Requesting State shall be noted for later resolution by the Requesting State but will not preclude the taking of testimony or the production of documents in the Requested State. Finally, the article provides a mechanism for authentication of any items which are produced or which are the subject of testimony taken in the Requested State under this article in order to insure admissibility in evidence in the Requesting State.

Article 9 requires the Requested State to provide the Requesting State with copies of publicly available documents, records or information in the possession of government departments and agencies in the Requested State. The Requested State retains the discretion to provide non-public official records or information in such departments' and agencies' possession to the same extent and under the same conditions as they are available to judicial authorities and the Fiscal Ministry in Spain or to law enforcement and judicial authorities in the United States. The article provides a mechanism for authentication of official records produced under this article in order to insure admissibility in evidence in the Requesting State.

Article 10 provides a mechanism for a Requesting State to invite the voluntary appearance and testimony in its territory of a person located in the Requested State. In such a case, the Central Authority of the Requested State is required to invite the person to appear in a non-compulsory manner, and to promptly inform the Requesting State of the person's response. The request must indicate the extent to which the person's expenses will be reimbursed and may also indicate the extent to which the Requesting State will assure the person safe conduct while in its territory in accordance with Article 11(4).

The Requested State is required to notify the person if no assurances are given. Any safe conduct provided under the article ceases fifteen days after the person's presence is no longer required in the

Requesting State or whenever the person voluntarily enters that State after having left.

Article 11 provides for the voluntary transfer to the Requesting State of a person in custody in the Requested State, as well as the voluntary transfer to the Requested State of a person in custody in the Requesting State, for purposes of assistance under the Treaty, provided both States agree. The article establishes the express authority and the obligation for the Receiving State to maintain the person in custody unless otherwise indicated by the Sending State. It further specifies the requirements for keeping the person in custody, insuring his return, and deducting the time spent in custody in one State pursuant to a request made under the Treaty from the time remaining to be served in the other State. The article further guarantees that the person transferred will be entitled to safe conduct and, while in the territory of the Receiving State, will not be detained or prosecuted for offenses committed before leading the Sending State or be required to testify in proceedings not specified in the request. Such safe conduct ceases when the person voluntarily prolongs his stay in the Receiving State for more than fifteen days from the time his presence is no longer required or after he has left the Receiving State and voluntarily returns. If a person appears in a trial in the Requesting State under this article, he may not be prosecuted on the basis of his testimony, except for contempt or perjury.

Article 12 requires the Requested State to use its best efforts to locate or identify persons, such as witnesses or suspects, specified in a request.

Article 13 obligates the Requested State to execute a request for service of any document relating to a request under the Treaty. Any request for the service of a document requiring a person to appear in the Requesting State must be transmitted a reasonable time before the scheduled appearance. The Requested State is required to return proof of service.

Article 14 obligates each State to execute requests for search, seizure and delivery of any item to the Requesting State, if the request contains the necessary information to justify such action under the laws of the Requested State. The article also creates a mechanism for establishing the continuity of custody, and the identity and integrity of any such item in order to preserve its admissibility in evidence in the Requesting State. The article further provides for the protection of rights of any third parties to such items.

Article 15 requires the Requesting State to return all original documents, records or evidence obtained in execution of a request as soon as possible, unless the Requested State waives their return. Absent a specific request at the time of transmittal, copies of such material need not be returned.

Article 16 provides a mechanism for one Central Authority to notify the other when it believes that proceeds of crime are located in the territory of the other State. It requires the parties to assist one another, to the extent permitted by their respective laws, in forfeiture and restitution proceedings. The article confirms that the disposition of any proceeds or property forfeited to a Party is governed by its own domestic law and administrative procedures. The article permits the Parties to agree to share such property or pro-

IX

ceeds in a given case, to the extent permitted by their respective laws.

Article 17 provides that the Treaty does not impede any assistance or procedure available under other international agreements, bilateral arrangements, agreements and practices, or national laws.

Article 18 provides for the Parties to consult at mutually agreed times to facilitate the most effective use of the Treaty and to develop other agreements or arrangements for mutual legal assistance.

Article 19 enables either party to request the other to initiate a criminal proceeding if both states have jurisdiction over the matter. The Requested State is obliged to consider investigation and prosecution to the extent appropriate under its law and procedures and to notify the requesting State of any action taken in this regard.

Article 20 provides that the Treaty shall enter into force on the last day of the month following the exchange of the instruments of ratification and that either Party may terminate the Treaty through diplomatic channels effective on the last day of the sixth month following the month of notification to the other Party.

A Technical Analysis explaining in detail the provisions of the Treaty is being prepared by the United States negotiating delegation, consisting of representatives from the Departments of Justice and State, and will be transmitted separately to the Senate Committee on Foreign Relations.

The Department of Justice joins the Department of State in favoring approval of this Treaty by the Senate as soon as possible.

Respectfully submitted,

LAWRENCE S. EAGLEBURGER.

TREATY
ON MUTUAL LEGAL ASSISTANCE
IN CRIMINAL MATTERS
BETWEEN
THE UNITED STATES OF AMERICA
AND
THE KINGDOM OF SPAIN

(1)

2

## TABLE OF CONTENTS

Article 1. . . . . . . . . . . . . . . Object of the Treaty

Article 2. . . . . . . . . . . . . . . Central Authorities

Article 3. . . . . . . . . . . . . . . Limitations on Assistance

Article 4. . . . . . . . . . . . . . . Form and Content of Requests

Article 5. . . . . . . . . . . . . . Execution of Requests

Article 6. . . . . . . . . . . . . . Costs

Article 7. . . . . . . . . . . . . . Limitations of Use

Article 8. . . . . . . . . . . . . . Testimony or Evidence in the Requested State

Article 9. . . . . . . . . . . . . . Records of Government Agencies

Article 10. . . . . . . . . . . . . Testimony in the Requesting State

Article 11. . . . . . . . . . . . . Transfer of Persons in Custody

Article 12. . . . . . . . . . . . . Location or Identification of Persons or Items

Article 13. . . . . . . . . . . . . Service of Documents

Article 14. . . . . . . . . . . . . Search and Seizure

Article 15. . . . . . . . . . . . . Return of Items

Article 16. . . . . . . . . . . . . Proceeds of Crime

Article 17. . . . . . . . . . . . . Compatibility with Other Agreements

Article 18. . . . . . . . . . . . . Consultations

Article 19. . . . . . . . . . . . . Initiation of Criminal Proceedings in the Requested State

Article 20. . . . . . . . . . . . . Ratification, Entry into Force, and Termination

Form A. . . . . . . . . . . . . . . Certificate of Authenticity of Business Records

Form B. . . . . . . . . . . . . . . Attestation with Respect to Seized Items

3

The United States of America and the Kingdom of Spain,

Wishing to cooperate within the framework of their friendly relations, and

Inspired by the desire to cooperate to facilitate the administration of justice in criminal matters,

Have decided to conclude a mutual legal assistance Treaty under the following terms:

4

- 2 -

ARTICLE 1

Object of the Treaty

1.  The Contracting States shall provide mutual assistance, in accordance with the provisions of this Treaty with respect to investigations and prosecutions in criminal matters conducted in each.

2.  Assistance shall include:

(a) taking the testimony or statements of persons;

(b) providing documents, records, and articles of evidence;

(c) serving documents;

(d) locating or identifying persons or items;

(e) transferring persons in custody for testimony or other purposes;

(f) executing requests for searches and seizures;

(g) immobilizing assets;

(h) assisting in proceedings related to forfeiture and restitution;

(i) initiating criminal proceedings in the Requested State; and

(j) any other form of assistance not prohibited by the laws of the Requested State.

3.  Assistance shall be provided without regard to whether the act giving rise to the request for assistance is a crime in

5

- 3 -

the Requested State. If, however, assistance is requested for purposes of paragraph 2(h), it will be necessary for the act giving rise to that proceeding to constitute a crime and be punishable by a sentence consisting of the deprivation of liberty for a period of more than one year under the laws of both Contracting States.

4. This Treaty is intended solely for mutual legal assistance between the Contracting States. The provisions of this Treaty shall not give rise to a right on the part of any private person to obtain, suppress, or exclude any evidence, or to impede the execution of a request.

ARTICLE 2

Central Authorities

1. Each Contracting State shall designate a Central Authority to make and receive requests pursuant to this Treaty.

2. For the United States of America, the Central Authority shall be the Attorney General or such persons designated by him. For Spain, the Central Authority shall be the Ministry of Justice (Office of the Technical General Secretariat) or such persons designated by it.

3. The Central Authorities shall communite directly with one another for the purposes of this Treaty.

6

- 4 -

## ARTICLE 3
### Limitations on Assistance

1.  The Central Authority of the Requested State may deny
assistance if:

(a) the request relates to an offense under military
law which would not be an offense under ordinary criminal
law; or

(b) the execution of the request would prejudice the
security or similar essential interests of the Requested
State.

2.  Before denying assistance pursuant to this Article, the
Central Authority of the Requested State shall consult with the
Central Authority of the Requesting State to consider whether
assistance can be given subject to such conditions as it deems
necessary.  If the Requesting State accepts assistance subject
to these conditions, it shall comply with the conditions.

3.  If the Central Authority of the Requested State denies
assistance, it shall inform the Central Authority of the
Requesting State of the reasons for the denial.

## ARTICLE 4
### Form and Content of Requests

1.  A request for assistance shall be in writing except
that the Central Authority of the Requsted State may accept a
request in another form in cases of urgency.  In any such case,

7

- 5 -

the request shall be confirmed in writing within ten days
unless the Central Authority of the Requested State agrees
otherwise. The request shall be in the language of the
Requested State, unless otherwise agreed.

2. The request shall include the following:

(a) the name of the authority conducting the
investigation, prosecution, or proceeding to which the
request relates;

(b) a description of the subject matter and nature of
the investigation, prosecution, or proceeding, including
the specific criminal offenses which relate to the matter;

(c) a description of the evidence, information, or
other assistance sought; and

(d) a statement of the purpose for which the evidence,
information, or other assistance is sought.

3. To the extent necessary and possible, a request shall
also include:

(a) information on the identity and location of any
person from whom evidence is sought;

(b) information on the identity and location of a
person to be served, that person's relationship to the
proceeding, and the manner in which service is to be made;

(c) information on the identity and whereabouts of a
person to be located;

(d) a precise description of the place or person to be
searched and of the items to be seized;

8

- 6 -

(e) a description of the manner in which any testimony or statement is to be taken and recorded;

(f) a list of questions to be asked of a witness;

(g) a description of any particular procedure to be followed in executing the request;

(h) information as to the allowances and expenses to which a person asked to appear in the Requesting State will be entitled; and

(i) any other information which may be brought to the attention of the Requested State to facilitate its execution of the request.

ARTICLE 5

Execution of Requests

1.  The Central Authority of the Requested State shall promptly execute the request or, when appropriate, transmit it to the authority having jurisdiction to do so.  The competent authorities of the Requested State shall do everything in their power to execute the request.  The Courts of the Requested State shall have authority to issue subpoenas, search warrants, or other orders necessary to execute the request.

2.  When necessary, the request shall be presented to the appropriate authority by the persons designated by the Central Authority of the Requested State.

3.  Requests shall be executed in accordance with the laws of the Requested State except to the extent that this Treaty

9

- 7 -

provides otherwise.  However, the method of execution specified in the request shall be followed except insofar as it is prohibited by the laws of the Requested State.

4.  If the Central Authority of the Requested State determines that execution of a request would interfere with an ongoing criminal investigation or proceeding in that State, it may postpone execution, or make execution subject to conditions determined to be necessary after consultations with the Central Authority of the Requesting State.  If the Requesting State accepts the assistance subject to the conditions, it shall comply with the conditions.

5.  The Requested State shall use its best efforts to keep confidential a request and its contents if such confidentiality is requested by the Central Authority of the Requesting State. If the request cannot be executed without breaching the requested confidentiality, the Central Authority of the Requested State shall so inform the Central Authority of the Requesting State, which shall then determine whether the request should nevertheless be executed.

6.  The Central Authority of the Requested State shall respond to reasonable inquiries by the Central Authority of the Requesting State concerning progress toward execution of the request.

7.  The Central Authority of the Requested State shall promptly inform the Central Authority of the Requesting State of the outcome of the execution of the request.  If the request is denied, the Central Authority of the Requested State shall

10

- 8 -

inform the Central Authority of the Requesting State of the
reasons for the denial.

ARTICLE 6

Costs

The Requested State shall pay all costs relating to the
execution of the request, except for the fees of expert
witnesses, the costs of translation and transcription, and the
allowances and expenses related to travel of persons pursuant
to Articles 10 and 11, which fees, allowances, and expenses
shall be paid by the Requesting State.

ARTICLE 7

Limitations of Use

The Central Authority of the Requested State may request
that information or evidence furnished under this Treaty be
kept confidential or be used only subject to terms and
conditions it may specify.  In that case, the Requesting State
shall use its best efforts to comply with the conditions.
Information or evidence which has been made public in the
Requesting State in accordance with this Treaty may thereafter
be used for any purpose.

11

- 9 -

ARTICLE 9

Taking Testimony or Evidence in the Requested State

1. A person in the Requested State from whom evidence is requested pursuant to this Treaty shall be compelled, if necessary, to appear and testify or produce any item, including, but not limited to, documents, records, and articles of evidence. A person who gives false testimony, either orally or in writing, in execution of a request, shall be subject to prosecution and punishment in the Requested State in accordance with the criminal laws of that State.

2. Upon request, the Central Authority of the Requested State shall furnish information in advance about the date and place of the taking of the testimony or evidence pursuant to this Article.

3. The Requested State shall permit the presence of such persons as specified in the request during the execution of the request, and shall allow such persons to question the person whose testimony or evidence is being taken.

4. If the person referred to in paragraph 1 asserts a claim of immunity, incapacity, or privilege under the laws of the Requesting State, the testimony or evidence shall nonetheless be taken and the claim made known to the Central Authority of the Requesting State for resolution by the authorities of that State.

5. Any items produced in the Requested State pursuant to this Article or which are the subject of testimony taken under

12

- 10 -

this Article may be authenticated by an attestation, including, in the case of business records, authentication in the manner indicated in Form A appended to this Treaty.  Documents authenticated by Form A shall be admissible in evidence in the Requesting State as proof of the matters set forth therein.

ARTICLE 9

Records of Government Agencies

1.  The Requested State shall provide the Requesting State with copies of publicly available documents, records, or information in the possession of government departments and agencies in the Requested State.

2.  The requested State may provide copies of any documents, records, or information which are in the possession of a government department or agency in that State, but which are not publicly available, to the same extent and under the same conditions as such copies would be made available, in Spain, to its judicial authorities and the Fiscal Ministry, and, in the United States, to its own law enforcement and judicial authorities.  The Requested State may, in its discretion, deny a request pursuant to this paragraph entirely or in part.

3.  Official records produced pursuant to this Article may be authenticated under the provisions of the Convention Abolishing the Requirement of Legalization for Foreign Public Documents, dated 5 October 1961.  No further authentication

13

- 11 -

shall be necessary.  Documents authenticated under this paragraph shall be admissible in evidence in the Requesting State.

## ARTICLE 10

### Testimony in the Requesting State

1.  Upon request, the Requested State shall invite a person in that State to appear before the appropriate authority in the Requesting State.  The Central Authority of the Requested State shall promptly inform the Central Authority of the Requesting State of the person's response.

2.  The request shall indicate the extent to which the invited person's expenses will be reimbursed.  If that person so requests, the Requesting State may provide funds with respect to those expenses in advance through its embassy in the Requested State.

3.  The request may indicate the extent to which the Requesting State will give the invited person assurances pursuant to Article 11(4).  If the Requesting State provides no assurances, the Requested State shall so notify the person.

4.  Any safe conduct provided pursuant to this Article shall cease when the person invited voluntarily extends his stay in the Requesting State more than 15 days from the time his presence is no longer required by that State or when the person, having left the Requesting State, voluntarily returns.

14

- 12 -

## ARTICLE 11
### Transfer of Persons in Custody

1.  A person in the custody of the Requested State whose presence in the Requesting State is needed for purposes of assistance under this Treaty shall be transferred to the Requesting State if both the person and the Central Authority of the Requested State consent to the transfer.

2.  A person in the custody of the Requesting State whose presence in the Requested State is needed for purposes of assistance under this Treaty may be transferred to the Requested State if both the person consents and the Central Authorities of both States agree.

3.  For purposes of this Article:

(a) the receiving State shall have the authority and the obligation to keep the person transferred in custody unless otherwise authorized by the sending State;

(b) the receiving State shall return the person transferred to the custody of the sending State as soon as circumstances permit or as otherwise agreed by both Central Authorities;

(c) the receiving State shall not require the sending State to initiate extradition proceedings for the return of the person transferred; and

(d) the person transferred shall receive credit for service of the sentence imposed in the sending State for time served in the custody of the receiving State.

15

- 13 -

4.  A person transferred pursuant to this Article may not, while in the receiving State:

(a) be subject to service of process or be detained or subject to any restriction of personal liberty by reason of any acts which preceded his departure from the sending State other than as provided in paragraph 3; or

(b) without his consent, be required to testify in proceedings not specified in the request.

5.  The safe conduct established in the above paragraph shall cease when a person freed in accordance with paragraph 3 voluntarily extends his stay in the Receiving State more than 15 days from the time his presence is no longer required by that State or when the person, having left the receiving State, voluntarily returns.

6.  Persons appearing in a trial in the Requesting State under the provisions of this Article may not be prosecuted on the basis of their testimony except for contempt or perjury.


ARTICLE 12

Location or Identification of Persons or Items


The Requested State shall use its best efforts to ascertain the location or identity of persons or items specified in the request.

16

- 14 -

ARTICLE 13

Service of Documents

1.  The Requested State shall use its best efforts to
effect service of any document relating to a request for
assistance made by the Requesting State under the provisions of
this Treaty.

2.  The Requesting State shall transmit a request for the
service of a document requiring the appearance of a person
before an authority in the Requesting State a reasonable time
before the scheduled appearance.

3.  The Requested State shall return a proof of service in
the manner specified in the request or acceptable under the
provisions of the Hague Convention on the Service Abroad of
Judicial and Extrajudicial Documents in Civil or Commercial
Matters.

ARTICLE 14

Search and Seizure

1.  The Requested State shall execute a request for the
search, seizure and delivery of any item, including, but not
limited to, any document, record, or article of evidence, to
the Requesting State if the request includes the information
justifying such action under the laws of the Requested State.

2.  Upon request, every official who has custody of a
seized item shall certify, through the use of Form B appended

17

- 15 -

to this Treaty, the continuity of custody, the identity of the item, and the integrity of its condition.  No further certification shall be required.  The certificate shall be admissible in evidence in the Requesting State as proof of the truth of the matters set forth therein.

3.  The Central Authority of the Requested State may require that the Requesting State agree to terms and conditions deemed necessary to protect the interests of bona fide third parties in the item to be transferred.

ARTICLE 15

Return of Items

The Central Authority of the Requesting State shall return all original documents, records, or articles of evidence furnished to it in execution of a request as soon as possible unless the Central Authority of the Requested State waives their return.  The Central Authority of the Requesting State need not return any copy so furnished unless the Central Authority of the Requested State specifically so requests at the time it furnishes the copy.

ARTICLE 16

Proceeds of Crime

1.  The Central Authority of either State shall notify the Central Authority of the other State of proceeds of crime

18

- 16 -

believed to be located in the territory of the other State.

2.  The Contracting States shall assist each other to the extent permitted by their respective laws in proceedings relating to the forfeiture of the fruits and instrumentalities of offenses and restitution to the victims of crime.

3.  Proceeds or property forfeited to a Contracting State pursuant to this Article shall be disposed of by that State according to its domestic law and administrative procedures. Either State may transfer such property, the proceeds of its sale, or a percentage thereof, to the other State, to the extent permitted by its respective laws, upon such terms as they may determine.

ARTICLE 17

Compatibility With Other Agreements

Assistance and procedures set forth in this Treaty shall not prevent either of the Contracting States from granting assistance to the other State through the provisions of other international agreements to which it may be a party, or through the provisions of its national laws.  The Parties may also provide assistance pursuant to any bilateral arrangement, agreement, or practice which may be applicable.

19

- 17 -

ARTICLE 18

Consultations

1.  The Central Authorities may consult, at times mutually agreed to by them, to enable the most effective use to be made of this Treaty.

2.  The Contracting States agree to consult as appropriate to develop other specific agreements or arrangements, formal or informal, on mutual legal assistance.

ARTICLE 19

Initiation of Criminal Proceedings

in the Requested State

1.  Either Contracting State may transmit a request for the purpose of initiating a criminal proceeding before the appropriate authorities of the other Contracting State where both States have jurisdiction to investigate or prosecute. Such requests shall be transmitted through the respective Central Authorities.

2.  The Requested State shall consider initiating an investigation or prosecution to the extent appropriate under its laws, practices and procedures.  The Requested State shall notify the Requesting State of any action taken on the request.

3.  The request and documentation shall be written in the language of the Requested State or accompanied by a translation into that language.

20

- 18 -

ARTICLE 20

Ratification, Entry into Force, and Termination


1.  This Treaty shall be subject to ratification, and the instruments of ratification shall be exchanged at Madrid as soon as possible.

2.  This Treaty shall enter into force on the last day of the month following the exchange of instruments of ratification.

3.  This Treaty shall have no fixed term.  Either of the two States may terminate it by written notification through the diplomatic channel.  The termination shall take effect beginning on the last day of the sixth month following the month of notification.


IN WITNESS WHEREOF, the undersigned, being duly authorized by their respective Governments, have signed this Treaty.


DONE at Washington this twentieth    day of November  , 1990, in duplicate, in the English and Spanish languages, both texts being equally authentic.


FOR THE UNITED STATES
OF AMERICA:

FOR THE KINGDOM OF SPAIN:

22

- 20 -

Form D

ATTESTATION WITH RESPECT TO SEIZED ITEMS

I, _____, attest on penalty of criminal
            (name)
punishment for false statement or attestation that my position
with the Government of _____
                              (country)
is _____.  I received custody of the items

listed below from _____ on _____
                      (name of person)              (date)

at_____ in the same condition as when I received
     (place)

them (or, if different, as noted below).

    Description of Item:


    Changes in condition while in my custody:


Official Seal
                              _____
                              Signature

                              _____
                              Title

                              _____
                              Place

                              _____
                              Date